UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| Timothy Stephenson, ) | Civil Action No.: 8:04-1024-RBH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| Inergy Automotive Systems, Inc., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

In this matter, the plaintiff, Timothy Stephenson, alleges causes of action for violations of the Americans with Disabilities Act of 1990 ("ADA"), as amended, breach of contract, and breach of the covenant of good faith and fair dealing against the defendant Inergy Automotive Systems, Inc., his former employer. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

Plaintiff originally filed this case in the Anderson County Court of Common Pleas on November 5, 2003. Defendant removed the case to this Court on April 1, 2004. Defendant filed a Motion for Summary Judgment on September 29, 2004. Plaintiff filed a response on October 18, 2004. Defendant filed a reply on October 28, 2004.

This matter is now before the undersigned for review of the Report and Recommendation ("the Report") filed by United States Magistrate Judge Bruce H. Hendricks, to whom this case had previously been assigned pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 73.02(B)(2)(g). In her Report, Magistrate Judge Hendricks carefully considers these issues and recommends that the defendant's Motion for Summary Judgment be granted and the remaining state law claims remanded.

1

Defendant filed objections to the Report on April 22, 2005, contesting the recommendation to remand the state law claims. Plaintiff filed objections to the Report on April 22, 2005. Defendant filed a response to plaintiff's objections on January 20, 2005. In his objections the plaintiff objects to the Magistrate Judge's decision not to consider the opinion of Dr. Greene's reports.

> In conducting this review, the Court applies the following standard:
>
> The magistrate judge makes only a recommendation to the Court, to which any party may file written objections . . . . The Court is not bound by the recommendation of the magistrate judge but, instead, retains responsibility for the final determination. The Court is required to make a *de novo* determination of those portions of the report or specified findings or recommendation as to which an objection is made. However, the Court is not required to review, under a *de novo* or any other standard, the factual report and recommendation to which no objections are addressed. While the level of scrutiny entailed by the Court's review of the Report thus depends on whether or not objections have been filed, in either case, the Court is free, after review, to accept, reject, or modify any of the magistrate judge's findings or recommendations.

*Wallace v. Housing Auth. of the City of Columbia*, 791 F. Supp. 137, 138 (D.S.C. 1992) (citations omitted).

### **Summary Judgment Standard**

Defendant filed its motion for summary judgment pursuant to Rule 56, FRCP. The moving party bears the burden of showing that summary judgment is proper. Summary Judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rules 56(c), FRCP; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. *Celotex*, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Electrical Industrial Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Barber v. Hosp. Corp. of Am.*, 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at trial on the merits." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

**Facts**

The defendant is an international automotive fuel systems manufacturer with a facility in Anderson, South Carolina. The plaintiff was hired by the defendant on February 10, 1999, as a maintenance technician. Before being hired, the plaintiff told Ken Stamey, the supervisor of the maintenance technicians and the person who hired the plaintiff, that he could not read or write very well. Stamey allegedly told the plaintiff that they could "get around that." The plaintiff allegedly filled out his own employment application.

On August 1, 2001, the defendant implemented a skills matrix program to increase the skills of its current technicians so that they could maintain the more complex equipment the company was using. Under the new system, raises were awarded based upon skill level, as opposed to seniority. All maintenance personnel would be evaluated and rated under the matrix in personal reviews conducted semiannually. In December the plaintiff met with Stamey and Bob Lingle, the engineering manager, to review his progress under the skills matrix. According to Lingle, the plaintiff had made little or no progress under the skills matrix. According to the plaintiff, the defendant wanted the

3

maintenance technicians to "go to technical school to get certificates to get more money on raises." He testified in his deposition that he asked that he "get some accommodation to help [him] with technical school or can [they] bring classes to the plant, and they said it would cost too much money."

At the time of his December review, the plaintiff was earning wages commensurate with that of the highest skill level, level three. His skill ranking, however, indicated that he matched only 45% of level two and 10% of level three. The plaintiff was told that he would not get a pay increase during that period. During the review, the plaintiff told Lingle and Stamey that he could not read and write well due to dyslexia. Lingle and Stamey told the plaintiff that they would have to talk to the human resources department. Stamey notified Sandy Snider, the human resource manager, of the plaintiff's claim, and she then met with the plaintiff. The plaintiff told Snider that he could not read or write at all. When asked how he had been able to perform his job, the plaintiff replied that "he had been falsifying the documents." The plaintiff further explained that he had been copying the documents enough to get by. Snider testified in her deposition that she felt there some safety concerns with regard to the plaintiff working during the holiday shutdown. She was concerned that the plaintiff would not be able to read the safety signs that were posted with regard to movement of machines. Snider told the plaintiff to take the paid holiday time off and that when he came back to work she would need some type of documentation regarding his ability to read.

The plaintiff's attorney wrote the defendant on December 26, 2001, stating that the plaintiff would provide the company with medical documentation regarding his disability and requesting that the plaintiff be given back pay, including any overtime or premium pay he missed during the holiday shutdown. Defense counsel wrote back on January 2, 2002, stating that the defendant was trying to make a determination as to whether the plaintiff was a qualified individual with a disability and noting that when the requested documentation was provided, accommodation for the alleged disability would

4

be discussed.

The plaintiff had a psycho-educational evaluation by a licensed counseling psychologist, Dr. Leslie B. Greene, on January 4, 2002. According to the report of that evaluation, the plaintiff had a verbal IQ of 79. After submitting the plaintiff to testing, the psychologist concluded that the plaintiff was functioning immediately below the cut-off point separating the "high borderline" from the "dull normal" ranges intellectually. His reading and spelling skills were below a third grade level, and his math skills were at a fourth grade level. The psychologist estimated that the plaintiff's spelling and reading faculties confirmed the designation of "functionally illiterate."

The plaintiff provided the report of Dr. Greene to the defense counsel on January 7, 2002. In response to the report, defense counsel noted that Dr. Greene failed to make any connection between the plaintiff's IQ and reading level with any mental disability. The defendant requested that the plaintiff return to work immediately and resume the duties he was performing prior to December 19, 2001. By letter dated February 13, 2002, plaintiff's counsel provided the defendant with an addendum to Dr. Greene's report in which he stated:

> Mr. Stephenson's style of dealing with the spelling and reading tasks presented to him demonstrate that his functional illiteracy is founded on a basic learning disability and more specifically, stemming from a Reading Disorder (315.00). It may also be pointed out that this condition catalogued in the DSM IV is also termed, dyslexia. One excerpt from the DSM-IV, reflects that "In individuals with Reading Disorder (which has also been called, 'dyslexia'), oral reading is characterized by distortions, substitutions, or omissions; both oral and silent reading are characterized by slowness and errors in comprehension.". . . As a general overview, Mr. Stephenson's test-related response pattern contains elements of the various diagnoses of (1) Reading and (2) Mathematics Disorder and (3) Disorder of Written Expression, each requiring special remediation, according, either to his own personal needs or those associated with the practical aspects of his work situation.

(Plaintiff's Response to Motion for Summary Judgment, Exhibit A, p. 29.)

The plaintiff returned to work for the defendant in January 2002. On January 22, 2002, Stamey spoke with the plaintiff regarding the status of work orders assigned to him. On January 31, 2002, Snider discussed with the plaintiff "company documents and [the defendant's] position regarding truthfulness and accuracy in completing all company documents." She told the plaintiff that if he falsified any company documents he would be terminated from employment.

On February 1, 2002, Stamey spoke with the plaintiff again about outstanding work orders, some of which were more than one year past due. The plaintiff responded that he needed someone to "guide him" in doing the work as he was not capable of doing the work alone. Stamey told the plaintiff that the work was his responsibility and was the job for which he was paid. The plaintiff responded that he was not able to perform the work. Stamey told the plaintiff that he would schedule someone else in the department to do the work. On March 4, 2002, Lingle met with the plaintiff to discuss alleged performance deficiencies.

In his July 2002 performance evaluation, the plaintiff was rated as "needs improvement." The plaintiff's pay rate did not change. On August 23, 2002, the defendant issued a written warning to the plaintiff claiming that he had been negligent in performing a repair job.

On September 16, 2002, the defendant issued a written warning to the plaintiff, stating that the plaintiff failed to report to work on the weekend of September 14-15, 2002. The warning stated that the plaintiff admitted that he knew the entire department was working that weekend because he had asked his co-workers. The plaintiff stated that because he was not personally asked to work, he did not show up for work. The warning noted that it was the last warning that would be issued to the plaintiff regarding his performance, and any further infractions would result in immediate termination of employment. The warning stated that the plaintiff's behavior had created disruption in the department, and other technicians questioned why the plaintiff "'gets away' with so much." The

6

plaintiff testified in his deposition that he was at the maintenance technicians' meeting when it was announced that the technicians would be working overtime that weekend. He also stated that he was not personally asked to work and he thought there were enough employees to cover the work, so he went hunting instead of working.

On September 18, 2002, the defendant terminated the plaintiff's employment, on the basis that the plaintiff took an excessively long break from work. The defendant's policy limits morning breaks to fifteen (15) minutes, and the plaintiff was aware of this policy. According to the notice of corrective action, Stamey observed the plaintiff in the canteen and smoke area between 8:45 a.m. and 9:25 a.m. When questioned about the length of his break, the plaintiff stated that he went to the canteen at 8:50 a.m. rather than 8:45 a.m. In his deposition, the plaintiff stated that he was on break "maybe 20" minutes. Snider testified that he examined the videotape from the break room and it confirmed that the plaintiff had taken an excessive break in violation of company policy.

School records submitted by the plaintiff show that when the plaintiff was in the eleventh grade, screening was conducted that indicated he had a "language" problem. The person who did the tests certified that the plaintiff "has met all criteria for participation in a program for speech/ language handicapped." A program of group therapy was recommended. A progress report dated January 31, 1979, indicated that the plaintiff's language problem was moderate to severe. The report stated that the area worked on was "basic receptive and expressive language," and the plaintiff had achieved 73% accuracy on language concepts.

### Dr. Greene's Reports

In his objections, the plaintiff "asserts that even if Dr. Greene's reports cannot be considered as expert opinion evidence, they should be admissible as factual evidence of the information

Defendant had available from shortly after the point in time that Mr. Stephenson requested an accommodation." (Plaintiff's Objections p. 1.)

In her report, the Magistrate Judge found that it would be inappropriate to consider the reports of Dr. Greene because he was not designated as an expert pursuant to the July 29, 2004, deadline established by the Conference and Scheduling Order. She also stated, in a footnote, that even if Dr. Greene's reports were considered "Dr. Greene is somewhat equivocal as to diagnosing the plaintiff with a learning disability. . . . While Dr. Greene did state that the plaintiff exhibits 'elements' of certain learning disorders, he has not 'diagnosed [the plaintiff] with several specific mental impairments' as argued by the plaintiff." (Report, p. 11, n. 1.)

This Court respectfully disagrees with the Magistrate Judge's decision to disregard the reports of Dr. Greene. The purpose of expert designation is to put the opposing party on notice of who a party intends to rely on and call at trial. It is clear to this Court, that defendant had notice of Dr. Greene's reports and is not prejudiced by this Court's decision to review those reports. The plaintiff provided the original report to defendant's counsel on January 7, 2002, and the addendum on February 13, 2002. Additionally, the plaintiff did identify Dr. Greene as an expert in his Local Civil Rule 26.03 interrogatories. This Court sees no reason to disclose the reports of Dr. Greene on a mere technicality, when the defendant clearly had notice of Dr. Greene and his opinions. Additionally, Dr. Greene's reports are not "somewhat equivocal," as the Magistrate Judge stated. In fact, in the addendum, he specifically diagnoses the plaintiff with dyslexia (reading), dysalculia (mathematics), and a disorder of written expression.

### **ADA Claim**

The plaintiff alleges that Inergy unlawfully discriminated against him by failing to reasonably accommodate his alleged disability and terminating his employment because of his condition. The

8

ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined as an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that individual holds. 42 U.S.C. § 12111(8). If a qualified individual cannot perform his job without reasonable accommodation, the ADA imposes the affirmative obligation upon the covered entity to make reasonable accommodations to the known physical or mental limitations of that individual unless doing so would impose an undue hardship on the operation of the business of the entity. 42 U.S.C. § 12112(b)(5)(A).

To establish a *prima facie* case under the ADA, plaintiff must establish: (1) he was an individual who had a disability within the meaning of the statute; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his employer refused to make such accommodations. *See Rhoads v. F.D.I.C*, 257 F.3d 373, 392 (4th Cir. 2001).

**Disability**

To be disabled, as defined by the ADA, a person must have "A) a physical or mental impairment that substantially limits one or more major life activities of such individual; B) a record of such an impairment; or C) [been] regarded as having such an impairment." 42 U.S.C. § 12102(2). The phrase "substantially limits" establishes a threshold that excludes minor impairments from ADA coverage. *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001). An impairment must interfere with a major activity "considerabl[y]" or "to a large degree" and be permanent or long-term to satisfy the "substantially limits requirement. *Toyota Motor Mfg., Ky., Inc. v. William*, 534 U.S. 184, 191

9

(2002). Whether "a person is disabled is an individualized inquiry, particular to the facts of each case." *Id*. *See also Sutton v. United Air Lines*, 527 U.S. 471, 483 (1999). A plaintiff's "significant restriction in a major life activity must be 'compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Sara Lee*, 237 F.3d at 352 (*citing* 29 C.F.R. § 1630.2(j)(2)).

The term "substantially limits" is not defined in the regulations. Some guidance in interpreting this phrase can be found in the regulations implementing the ADA. Those regulations include the statement that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Cases defining "substantially limits" make it clear that this ADA regulation represents an accurate definition of the phrase. *See Sutton*, 527 U.S. at 491 ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs.")

That an individual has been diagnosed with a syndrome or disease and treated by health care professional may be sufficient to establish a mental or physical impairment, but is not alone sufficient to establish that his impairment substantially limits one or more of his major life activities. *Sara Lee*, 237 F.3d at 352-353. The parties agree that illiteracy alone does not constitute a disability under the ADA. However, as laid out in the facts above, the plaintiff told the defendant that he had dyslexia in December of 2001. He additionally provided the defendant with Dr. Greene's identity and report in January, as well as the addendum in February of 2002. Under the Code of Federal Regulations "an individual who is unable to read because of dyslexia would be an individual with a disability because dyslexia, a learning disability, is an impairment." 29 C.F.R. Pt. 1630, App. § 1630.2(j).

**Discharge**

The defendant states in the motion for summary judgment: "Inergy does not dispute that Stephenson was terminated from his employment, therefore, the second element of the prima facie case is satisfied." (At p. 18.) While defendant argues that the plaintiff suffered no other adverse employment actions, all that is needed to establish a *prima facie* case is that he was terminated. *See Rhoads*, 257 F.3d at 392.

**Job Performance**

The defendant argues that, at the time of his discharge, the plaintiff was not performing the job at a level that met his employer's legitimate expectations. In making this argument, defendant relies on performance reviews as well as verbal and written warnings issued to the plaintiff. From the evidence presented to the Court, the reviews and warnings were issued between January and September of 2002, subsequent to plaintiff's request for accommodation in December of 2001. The plaintiff argues that for the three (3) years prior to requesting accommodation he received regular, and even good, performance evaluations.

As this is defendant's motion for summary judgment, this Court must view all evidence in the light most favorable to the plaintiff as the non-moving party. Consequently, this Court finds that there is a genuine question of material fact as to whether the plaintiff was performing his job at a level that met his employer's legitimate expectations.

**Request for Accommodations**

The defendant argues that the plaintiff has failed to establish that he was denied reasonable accommodation. Defendant states that "the only assistance which Stephenson testified that he ever asked for and did not receive was a tutor for technical school classes." (Reply in Support of Motion for Summary Judgment p. 7.) Plaintiff argues that the defendant refused to consider providing him

with reasonable accommodations. It appears to the Court that there is a question of fact as to what accommodations the plaintiff requested and defendant's response to any such requests.

**Legitimate Non-Discriminatory Reason and Pretext**

If the plaintiff is able to establish a *prima facie* case, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The defendant has offered a legitimate, nondiscriminatory reason for terminating the plaintiff, based on performance reviews and verbal and written warnings.

If the employer is able to offer a legitimate, nondiscriminatory reason for its actions, the presumption drops from the case, and the burden is then on the plaintiff to come forward with evidence that the employer's asserted reason for its actions are a mere pretext for improper discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804. The plaintiff alleges that the negative performance reviews and warnings were all subsequent to his request for accommodation. Consequently, this Court finds that there is a genuine issue of material fact as to whether the legitimate, nondiscriminatory reason provided by the defendant is in fact pretext for discriminatory conduct.

<b><u>State Law Claims</u></b>

As to the state law claims, the plaintiff states that "he understands that Defendant may attempt to assert diversity jurisdiction, presumably pursuant to 28 U.S.C. § 1332. If so, Mr. Stephenson hereby stipulates that the amount in controversy, exclusive of interest and costs, does not and shall not exceed $75,000." (Plaintiff's Objections p. 1.)

The defendant removed this case under both federal question and diversity jurisdiction. Plaintiff does not contest that there is diversity of citizenship; however, she does contest that the

amount of controversy is greater than $75,000. In determining diversity jurisdiction, the value of a claim is determined at the time an action is filed. *Sellers v. O'Connell*, 701 F.2d 575, 578 (6th Cir. 1983). A plaintiff cannot attempt to limit the amount of damages sought after removal to defeat diversity jurisdiction. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289-90 (1938); *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995); *Griffin v. Red Run Lodge, Inc.*, 610 F.2d 1198, 1204 (4th Cir. 1979). That is exactly what the plaintiff is attempting to do in the instant case. Consequently, plaintiff counsel's statement limiting recovery to $75,000 is ineffective to deprive this Court of jurisdiction. Consequently, this Court will analyze the state law claims as well.

In his complaint, plaintiff has alleged causes of action for breach of contract and breach of the covenant of good faith and fair dealing. This Court will address each cause of action in turn.

**Breach of Contract**

An individual working for an employer under a contract of employment for an indefinite period can be terminated at will. *Shealy v. Fowler*, 188 S.E. 499 (S.C. 1936). At-will employment is generally terminable by either party at any time, for any reason or for no reason at all. *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 278 S.E.2d 607 (S.C. 1981). The termination of an at-will employee normally does not give rise to cause of action for breach of contract. *Hudson v. Zenith Engraving Co., Inc.*, 259 S.E.2d 812 (1979). However, in certain limited situations, an employer's discharge of an at-will employee may give rise to a cause of action for wrongful discharge such as where the at-will status of the employee is altered by the terms of an employee handbook, *Small v. Springs Industries, Inc.*, 357 S.E.2d 452 (S.C. 1987) (*Small I*), or where the discharge violates a clear mandate of public policy. *Ludwick v. This Minute of Carolina, Inc.*, 337 S.E.2d 213 (S.C. 1985).

The existence of a contract for employment should be submitted to the jury when (1) its existence is questioned, and (2) the evidence is conflicting or is subject two more than one inference.

*Small I*, 357 S.E.2d at 454.  *Jones v. General Elec. Co.*, 503 S.E.2d 173 (S.C. Ct. App.1998).  The relevant issues for determining if the handbook forms a contract are whether (1) the handbook sets out procedures binding on the employer, (2) those procedures applied to the employee, and (3) the employer violated those procedures.  *Miller v. Schmid Labs., Inc.*, 414 S.E.2d 126 (S.C. 1992); *Jones*, 503 S.E.2d at 177.   an employer wishes to issue an employee manual without being bound by it, the employer must insert a conspicuous disclaimer or provision into the written document.  *Small I*, 357 S.E.2d at 455.  However,

> [T]he disclaimer is merely one factor to consider in ascertaining whether the handbook as a whole conveys credible promises that should be enforced. . . . [A] handbook that contains both promissory language and a disclaimer should be viewed as inherently ambiguous. . . . As with any question of fact, this is primarily a matter for the jury to decide. The court should intervene to resolve the handbook issue as a matter of law only if the handbook statements and the disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise either does or does not exist.

*Fleming v. Borden, Inc.*, 316 S.C. 452, 463-64, 450 S.E.2d 589, 596 (1994) (quoting Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers*, 13 Indus. Rel. L.J. 326, 375-76 (1991-92)).

In the instant case, Stephenson contends that defendant's Associate Handbook contained attempted at-will employment language as well as promissory language and was "inherently ambiguous."  The language cited by the plaintiff as "mandatory language" in the Associate Handbook is as follows:[1]

> Inergy is committed to establishing and preserving an "open door" environment.  **If employees have concerns about work conditions, compensation, fellow team members, policies or any other business practice, they are strongly encouraged to voice these concerns directly with management.**

---

[1] While the plaintiff has only provided portions of the employee handbook, the Court is including those portions in context.  The portion cited by the plaintiff is in bold.

14

> Our experience has shown that when employees deal openly and directly with management, the work environment can be excellent, communications can be clear, and attitudes can be positive. **Inergy is committed to responding effectively to employee concerns.**
>
> Inergy is committed to providing the best possible working conditions for its employees. **Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or questions receives a timely response from Inergy supervisors and management.**
>
> **Inergy strives to ensure fair and honest treatment of all employees.** Supervisors, managers and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.
>
> If employees disagree with established rules of conduct, policies, or procedures, they may express their concerns to their supervisor or department manager, any member of the Human Resources Department, the facility Plant Manager or the President and CEO -- North America. **No employee will be penalized, formally or informally, for voicing a complaint with Inergy in a reasonable, business-like manner.**

(Defendant's Exhibit F, p. 132.)

> **Inergy Automotive Systems provides a work environment that is free from intimidation, hostility or other offenses, which might interfere with work performance. Harassment of any sort that creates an intimidating, hostile of offensive working environment or compensation either implicitly or explicitly, including sexual harassment is considered to be a serious offense and will not be tolerated.**

(Defendant's Exhibit F, p. 132.)

> **Inergy Automotive Systems makes every effort to reasonably accommodate individuals with disabilities in order to provide employment opportunities for them. It is our intent to not discriminate against any qualified individual with a disability in regard to any term or condition of employment. In the event that a qualified disabled individual is unable to perform a job task on a regular basis due to a disability, the Company will determine whether such job task is an essential function and whether a "reasonable accommodation" can be made without imposing undue hardship on the Company.**

(Defendant's Exhibit F, p. 133.)

Because the evidence is conflicting as to whether the terms of Inergy's employee manual were

mandatory or permissive and whether Stephenson received oral assurances sufficient to create an

15

employment contract, this Court denies Inergy's motion for summary judgment on Stephenson's claims for breach of contract. *See Small I*, 357 S.E.2d at 454 (The question is for the fact finder if a handbook and other evidence creates conflicting inferences as to whether the employer altered the employee's at-will status.); *Kumpf v. United Tel. Co. of the Carolinas*, 429 S.E.2d 869 (S.C. Ct. App.1993) (If the existence of a contract is disputed and the evidence creates more than one reasonable inference, the question is one for the jury).

**Breach of the Covenant of Good Faith and Fair Dealing**

Traditionally, South Carolina courts did not recognize the existence of an implied covenant of good faith and fair dealing in the employment context. *See e.g., Satterfield v. Lockheed Missiles and Space Co., Inc.*, 617 F. Supp. 1359, 1364 (D.S.C. 1985) (the employment-at-will doctrine "is antithetical to the concept of an implied covenant of good faith and fair dealing"). Plaintiff argues that South Carolina first recognized the covenant of good faith and fair dealing in the employment setting in *Shelton v. Oscar Mayer Foods Corp.*, 459 S.E.2d 851, 857 (S.C. Ct. App. 1995). The defendant argues that since it was the South Carolina Court of Appeals that made this determination instead of the South Carolina Supreme Court, this Court is not bound by the *Shelton* decision.

In a diversity case, a federal district court applies the substantive law of the forum state. *Erie RR Co. v. Tompkins*, 304 U.S. 64 (1938). In this case, the parties agree that South Carolina is the forum state. In the absence of South Carolina authority on a question of law, this Court "must decide the case as [it] think[s] the highest court of South Carolina would if confronted with the same situation." *Reid v. Life Ins. Co. of North America, Inc.*, 718 F.2d 677, 680 (4th Cir. 1983). If the issue is a question of first impression, the decisions of courts of other jurisdictions are to be considered as persuasive authority. *Id*. However, in determining whether to follow the law of an intermediate court, a federal court "is not free to reject [a] state rule merely because it has not

16

received the sanction of the highest state court." *West v. AT&T*, 311 U.S. 223, 236 (1940). Rather,

> [w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*In Re: The Wallace & Gale Co.*, 385 F.3d 820, 830-31 (4th Cir. 2004); *accord Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940); *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997-1002-03 (4th Cir. 1998); *United States v. Little*, 52 F.3d 495, 498 (4th Cir. 1995); *Liberty Mut. Ins. Co., v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1992). Specific as to South Carolina law the Fourth Circuit has stated:

> As a federal court sitting in diversity, we have an obligation to apply the jurisprudence of South Carolina's highest court, the South Carolina Supreme Court. But in a situation where the South Carolina Supreme Court has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue. In so predicting, the South Carolina Court of Appeals' decisions, as the state's intermediate appellate court, constitute the next best indicia of what state law is, although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court in the state would decide otherwise.

*Private Mortgage Investment Servs., Inc. v. Hotel and Club Assoc. Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).

The defendant has failed to provide this Court with any reason why it should not recognize the covenant of good faith and fair dealing should apply to employment contracts in South Carolina other than the reason that the South Carolina Supreme Court has not so held. However, as mentioned above, the South Carolina Court of Appeals has held that such a covenant does exist in employment contracts. *See also Williams v. Riedman*, 529 S.E.2d 28 (S.C. 2000) (recognizing breach of covenant of good faith and fair dealing, but prohibiting tort recovery for the cause of action). In the absence of any persuasive reason not to follow the law as established by the South Carolina Supreme Court,

this Court acknowledges that breach of the covenant of good faith and fair dealing applies to employment contracts.

Defendant further argues that, if this Court finds that the covenant of good faith and fair dealing applies to employment contracts in South Carolina, the covenant did not exist was not breached in the instant case. First, defendant argues that because plaintiff was an employee-at-will, there was no employment contract for the covenant of good faith and fair dealing to attach to. As discussed above, this Court finds that there is a question of fact as to whether or not plaintiff had an employment contract with the defendant. Consequently, defendant's argument as to their being no contract must fail.

Second, defendant argues that even if there was an employment contract and such a covenant existed, Inergy did not breach the covenant. Defendant argues that it followed its disciplinary guidelines to the letter in its decision to terminate Stephenson and there no evidence that Stephenson's termination was motivated by an improper motive. However, the plaintiff alleges that the defendant failed or refused to comply with the provisions of the handbook. Clearly, there is a question of material fact sufficient to preclude summary judgment on this issue.

### Conclusion

I find that there are genuine issues of material fact precluding entry of summary judgment as a matter of law. For the foregoing reasons, the undersigned respectfully respectfully overrules the Report and Recommendation of the Magistrate Judge. Defendant's motion for summary judgment is **DENIED** as to plaintiff's ADA claims and **DENIED** as to his state law claims.

**AND IT IS SO ORDERED.**

(*Signature on Following Page.*)

                                                s/ R. Bryan Harwell
                                                R. Bryan Harwell
                                                United States District Court Judge

August 3, 2005
Florence, South Carolina